IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| LEONARD WILLIAMS, R05138, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-00506-MJR-RJD |
| | ) | |
| DR. JAMES FENOGLIO, | ) | |
| LYNN PHILLIPPE, | ) | |
| PHIL MARTIN, | ) | |
| STEPHANIE REED, | ) | |
| LT. ROBERT BOLDREY, | ) | |
| ALAN DALLAS, | ) | |
| BRIAN EUBANK, | ) | |
| DALLAS WILLIS, | ) | |
| RODNEY RHODES, | ) | |
| PATRICIA POTTS, | ) | |
| CLAUDIA DOWTY, | ) | |
| KELSEY CUMMINS, | ) | |
| MARC HODGE and | ) | |
| CECIL VAUGHN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**REAGAN, Chief Judge:**

Plaintiff Leonard Williams is an inmate in the Illinois Department of Corrections ("IDOC") prison system. On May 12, 2012, he injured his ankle while playing basketball in the Lawrence Correctional Center ("Lawrence") gymnasium. Williams was provided crutches and an ankle wrap, but his condition worsened three days later when his crutch slipped while he was ascending a flight of stairs. Williams fell backwards down the stairs, landing hard on his back and shoulder. Despite his repeated visits to the Lawrence Health Care Unit ("HCU"), Williams asserts that he did not receive adequate

1

medical treatment. Williams filed this lawsuit against various IDOC employees and employees of Wexford Health Sources, Inc. (Wexford), a contractor that provides health care services to IDOC inmates. The defendants moved for summary judgment. (Docs. 128, 135). For the following reasons, the Defendants' Motions for Summary Judgment are hereby **GRANTED**.

I. BACKGROUND

On May 12, 2012, Plaintiff Leonard Williams was playing basketball in the Lawrence prison gymnasium when he fell and injured his ankle. (Plaintiff's Deposition, Doc. 129-7, p. 5). Two correctional officers arrived shortly thereafter and carried Williams to the Lawrence HCU. *Id*. He arrived at the HCU at approximately 1:30 p.m., and he was examined by Nurse Hollingsworth. (Doc. 129-1, p. 2). Medical records from the examination indicate that Williams complained of pain (an "8" on the 1-10 scale) and tingling in his left ankle. *Id*. He also stated that he was unable to put weight on the ankle. *Id*. Nurse Hollingsworth observed swelling in the ankle and noted that Williams exhibited a limited range of motion. *Id*. She prescribed him Tylenol, an ACE wrap to stabilize the ankle, a pair of crutches, and a permit for ice. *Id*. Williams stated at his deposition that he also asked Nurse Hollingsworth for a low gallery and low bunk permit, but she told him that "it wasn't up to her." (Doc. 129-7, p. 5). After the examination, Williams was placed in a wheelchair, and a correctional officer escorted him back to his housing unit. *Id*.

Two days later on May 14, 2012, Williams returned to the Lawrence HCU to be examined by Dr. James Fenoglio. (Doc. 129-7, p. 6). An x-ray examination showed that

Williams's leg was not fractured. *Id*. However, Dr. Fenoglio observed that the ankle was swollen, and he diagnosed that it was sprained. (Doc. 129-1, p. 3). Dr. Fenoglio then reissued Williams a permit for the crutches and scheduled a follow up examination in two weeks. *Id*. Williams testified at his deposition that he also requested a low gallery and low bunk permit, but Dr. Fenoglio told him that such permits were issued by corrections staff. (Doc. 129-7, p. 6).[1]

Williams testified at his deposition that he requested a low bunk and low gallery permit from multiple other individuals. Between May 12, 2012, and May 15, 2012, Williams alleges that he spoke to Lt. Robert Boldrey on two occasions to request a low bunk and low gallery permit. (Doc. 129-7, p. 15). Lt. Boldrey told Williams that a doctor would need to approve that kind of permit. *Id*. During that same time period, Williams also requested a low bunk permit from Correctional Officer Cecil Vaughn. *Id*. at 16. Vaughn told Williams that he should request the permit from a doctor. *Id*. Additionally, Williams requested permits from Brian Eubanks, Dallas Willis, and Warden Marc Hodge, but they each told him to either speak to a Lieutenant or request a permit at the HCU. *Id*. at 17-19.

Lorie Cunningham, who is not a party to this litigation but is the current Health Care Unit Administrator at Lawrence, provided an affidavit attached to the IDOC Defendants' motion for summary judgment. (Doc. 136-1). Cunningham states in her

---

[1] In an affidavit attached to the Wexford Defendants' motion for summary judgment, Dr. Fenoglio disputes that Williams requested a low gallery and low bunk permit at the May 14, 2012, examination. (Doc. 129-2). Dr. Fenoglio states that if Williams had made such a request, he would have noted it in the medical records for the examination. (Doc. 129-2, p. 2). The medical records from that date do not mention Williams' gallery or bunk assignment. (Doc. 129-1, p. 3).

3

affidavit that low bunk and low gallery permits may only be authorized by a medical doctor, nurse practitioner, or a physician's assistant. *Id*. at p. 1. She also states that security staff members are not authorized to issue low bunk and low gallery permits, and that this policy was in effect in 2012. *Id*. at p. 1.

On May 15, 2012, Williams experienced another injury. (Doc. 129-7, p. 6). Williams's cell was located on the upper gallery, so he was required to descend a flight of stairs to get to ground level shower and telephones. *Id*. Williams wanted to use the shower that day, and his cellmate helped him walk down the flight of stairs. *Id*. After using the shower and placing a telephone call to his mother, Williams decided to navigate back up the stairs by himself using only one crutch. *Id*. When Williams was about three-quarters of the way up the stairs, his crutch slipped, and he fell backwards, landing on his back and shoulder. *Id*. at 7. The "Offender Injury Report" for the incident states "I/M was going up the stairs [with] one crutch when he was ordered to have 2 crutches – lost balance [and] fell down the stairs hurt his back [and] R shoulder." (Doc. 129-1, p. 37). Two correctional officers named Eubanks and Rhodes immediately came over to assist. (Doc. 129-7, p. 7). They then called a "Code 3" or medical emergency. *Id*.

Shortly thereafter, Williams was placed on a stretcher and wheeled to the HCU. *Id*. Williams testified at his deposition that Nurse Kelsey Cummins examined his ankle, back and shoulders. *Id*. At the conclusion of the examination, Williams was issued a low bunk and low gallery permit, some ibuprofen, and a renewal of the crutches permit. *Id*. at 8. Nurse Cummins then told Williams that there was "nothing wrong" with him. *Id*. at 33. Despite Williams's continued complaints of pain, at the conclusion of the medical

examination Correctional Officers Vaughn and Rhodes picked up Williams off the examining table and placed him in a wheelchair. *Id.* at 25. After this examination, Nurse Cummins provided no further treatment for Williams' back, shoulder or ankle. (Nurse Cummins Affidavit, Doc. 129-5, p. 2, ¶ 8).

On May 16, 2012, Williams was again examined by Dr. Fenoglio. (Doc. 129-2, p. 3, ¶ 11, Doc. 129-1, p. 3). Williams told Dr. Fenoglio that he slipped on the stairs and fell backwards onto his right shoulder. (Doc. 129-1, p. 3). Dr. Fenoglio then prescribed Williams an analgesic balm to apply to the injury. *Id*. Williams returned to see Dr. Fenoglio on May 21, 2012, for a follow up appointment regarding the ankle injury. (Doc. 129-1, p. 5). Williams told Dr. Fenoglio that his ankle was still swollen and that he was unable to put all of his weight on the leg. *Id*. Dr. Fenoglio decided to discontinue Williams' ibuprofen prescription, issued a 30 day prescription for Ultram (a stronger, opioid painkiller), discontinued the use of the right crutch, and scheduled a follow up appointment in one week. *Id*. Medical records from May 24 through May 26, 2012, indicate that Williams refused to take the prescribed Ultram on those dates. (Doc. 129-1, pp. 6-8). However, Williams testified at his deposition that he does not remember refusing the medication. (Doc. 129-7, p. 8).

Dr. Fenoglio next examined Williams for his ankle injury on May 29, 2012. (Doc. 129-1, p. 7). Dr. Fenoglio noted that Williams was "barely using [the] crutch," and that his ankle was swollen but improving. *Id*. He issued Williams a prescription for ibuprofen. *Id*. On June 1, 2012, Nurse Claudia Dowty examined Williams during "Nurse Sick Call." (Dowty Affidavit, Doc. 129-4, p. 2). Williams told Nurse Dowty that

5

he was experiencing pain in his right shoulder and that the Ultram medication was not helping. *Id*. Nurse Dowty then scheduled Williams for a follow up examination with the nurse practitioner. *Id*.

Williams underwent a shoulder and back examination on June 5, 2012, at the HCU by Nurse Practitioner Lynn Phillippe. (Doc. 129-3, p. 2, Doc. 129-1, pp. 10-11). Nurse Phillippe issued Williams a prescription for ibuprofen, renewed the low bunk and low gallery permit, and ordered spinal x-rays. (Doc. 129-1, p. 10). The x-rays were taken on June 7, 2012. (Doc. 129-1, p. 33). The x-rays did not show a spinal fracture or dislocation, but the radiologist noted "[m]ild degenerative changes of disc disease at L5-S1 level." *Id.* On June 19, 2012, Williams was again examined by Nurse Phillippe. (Doc. 129-1, p. 13). Williams complained of back pain and stated that his legs had recently given out in the chow hall line. *Id*. Nurse Phillippe instructed Williams on some exercises he could perform to build up his strength, issued him a prescription for Naproxen, and recommended that he use the analgesic balm on his back. *Id*. Medical records from the next day indicate that the HCU began to taper off Williams's Ultram prescription. (Doc. 129-1, p. 14).

On July 15, 2012, Williams was examined by Nurse Patricia Potts during "Nurse Sick Call." (Potts Affidavit, Doc. 129-6, p. 1). Williams told Nurse Potts that he was experiencing back pain and that he would like to be seen in the HCU for a follow up examination regarding his injuries. *Id*. at 2. Nurse Potts told Williams that she was willing to examine him, but he would be required to pay the $5.00 co-pay. *Id*. Williams

6

declined to pay the co-pay and immediately left. *Id*. This was the only instance in which Nurse Potts examined Williams for the injuries that form the basis of this lawsuit. *Id*.

Williams was next examined on August 12, 2012, by Nurse Claudia Dowty. (Doc. 129-4, p. 2). Williams told Nurse Dowty that he had experienced back and shoulder pain for the past three months. *Id*. He also told her that he had difficulty sleeping due to the pain. *Id*. Nurse Dowty noted tenderness in Williams' right shoulder and scheduled him for a follow up examination with the nurse practitioner. *Id*. On August 14, 2012, Nurse Phillippe examined Williams. (Doc. 129-3, p. 3). Williams told her that he was experiencing back pain, that he could not play basketball, and that the Naproxen prescription was not providing any relief. *Id*. Nurse Phillippe noted that he exhibited a normal gait and could demonstrate a full range of motion in his back. *Id*. She was unable to identify any physical indication of a problem, but she recommended that exercise and weight loss may be helpful. *Id*.

On September 9, 2012, Nurse Dowty examined Williams at Nurse Sick Call in regards to complaints of shoulder pain. (Doc. 129-4, p. 3). Nurse Dowty remarked during the examination that Williams was initially scheduled for Nurse Sick Call on August 22, 2012, but he opted instead to go to the gym. *Id*. Nurse Dowty states in her affidavit that Williams then became angry and confrontational and that he was escorted back to his cell by a correctional officer. *Id*. Although Nurse Dowty was unable to complete the examination, she referred Williams to be seen by a physician. *Id*.

Dr. Fenoglio examined Williams on September 13, 2012. (Doc. 129-1, p. 21). Williams told Dr. Fenoglio that he knew there was something wrong with the inside of

7

his right shoulder. *Id*. Dr. Fenoglio then arranged for an x-ray of the right shoulder and a referral for physical therapy. *Id*. The x-ray examination of the right shoulder took place on September 17, 2012. *Id*. The radiologist's report states "FINDINGS: There is normal bony alignment. There is no acute bony fracture or dislocation. Very minimal early osteoarthritis of the AC joint is seen." (Doc. 129-1, p. 34). This was Dr. Fenoglio's last examination of Williams.

On October 9, 2012, Health Care Unit Administrator Phil Martin wrote a note in Williams's medical records stating that his parents had sent a letter to the prison. (Doc. 129-1, p. 22). The letter stated that "[Williams] is not being treated appropriately for his [right] shoulder and back pain due to fall." *Id*. Martin then wrote in the "Plans" section of the chart "[r]efer to MD to review [right] shoulder x-rays and eval. back pain." *Id*. Martin wrote another note on October 10, 2012, stating that Williams was observed in the prison gymnasium playing basketball using both of his upper extremities, without any indication of pain and with a healthy range of motion. *Id*. Williams admitted at his deposition that he did play basketball once in October, but he said he was unable to fully participate in the game. (Doc. 129-7, p. 7).

Dr. Roderick Matticks, who is not a party to this litigation, examined Williams on October 12, 2012. (Doc. 129-1, p. 24). Williams told Dr. Matticks that his shoulder pain persisted and that he occasionally heard a "popping" sound in his shoulder but that he can play basketball without difficulty. *Id*. During the examination Dr. Matticks observed that Williams was "able to remove and replace shirt [without] difficulty." *Id*. He provided Williams with a shoulder strength training exercise handout but determined

that physical therapy was not needed. *Id*. Dr. Matticks also noted that "occ. OTC pain meds OK." *Id*.

Williams returned to Nurse Sick Call on October 15, 2012, with complaints of back pain. (Doc. 129-1, p. 25). Williams was examined by Nurse Stephanie Reed. Nurse Reed notified Williams that he was required to pay the $5.00 co-pay, but he declined to provide the co-pay authorization. *Id*. Additionally, Williams testified at his deposition that sometime during the examination Nurse Reed told him that he had an "X" on his back, which Williams understood to mean that he was being targeted for retaliation. *Id*. at 34. Nurse Reed then apparently ended the examination. *Id*. at 25.

Through the course of Williams' medical treatment at Lawrence, he experienced a strained relationship with the staff in the HCU. He filed numerous grievances asserting that he was not receiving proper care. Prior to the injuries at issue in this lawsuit, Williams complained that the food served in the prison chow hall (and its high soy content) was causing him to be constipated and that it was negatively affecting his overall health. (Doc. 133-3, pp. 3-9). Williams also states in his response to the Defendants' motions for summary judgment that on multiple occasions he signed up for nurse sick call, but he was not called down to the HCU. (Doc. 133, p. 6). Additionally, Williams notes that on his September 13, 2012, examination at the HCU, Dr. Fenoglio told him that his shoulder injury would have been cured by now if "you hadn't written grievances on Phil Martin and the medical staff." (Doc. 133, p. 5). However, Williams states that at the examination, Dr. Fenoglio arranged for x-rays and physical therapy. *Id.*

9

After October 2012, Williams's treatment record becomes less clear. Over the next several months, prison officials transferred Williams to Stateville Correctional Center multiple times for Court hearings. (Doc. 129-7, p. 10). Williams also started to receive treatment from another physician, Dr. Coe. *Id*. On May 23, 2013, Williams underwent a medical examination by Dr. Coe where he complained of right shoulder pain and back pain. (Doc. 133-3, p. 41). Dr. Coe then diagnosed Williams as having a rotator cuff injury. *Id*. Williams also received physical therapy through about October 2014, and he was transferred to Robinson Correctional Center in May 2015. *Id*. at p. 11. He was later transferred to Jacksonville Correctional Center, his current place of incarceration. (Doc. 129-7, p. 12). At his deposition, Williams testified that he continues to experience some pain in his shoulder and back. *Id*. at pp. 12-13. He also stated that he is unable to engage in physically strenuous activities involving his arms, but he does run three to four times per week. *Id*. at p. 13.

## II. ANALYSIS

Williams filed this lawsuit on May 2, 2014, (Doc. 1), and on June 2, 2014, Judge Gilbert screened the complaint pursuant to 28 U.S.C. § 1915A. (Doc. 7). In the screening order Judge Gilbert found that Williams articulated four constitutional tort claims and a state law medical negligence claim. The state law medical negligence claim was later dismissed without prejudice because Williams was unable to obtain the physician's certificate of merit pursuant to the Illinois Healing Art Malpractice statute at 735 ILCS 5/2-622. (Doc. 58). The claims were further whittled down because Williams did not exhaust administrative remedies against all of the defendants. (Doc. 106).

Williams now proceeds on the following four claims. **At Count 1**, Williams stated an Eighth Amendment claim for deliberate indifference to medical needs, against Defendants Dr. Fenoglio, Boldrey, Vaughn, Dallas, Willis, Eubank, and Hodge, for not providing Williams with the low bunk and low gallery permit after his ankle injury. **At Count 2**, Williams stated an Eighth Amendment claim against Defendants Fenoglio, Martin, Potts, Dowty, Cummins, Vaughn, and Rhodes for deliberate indifference to Williams' need for treatment of his back and shoulder injuries and for pain relief from those injuries. **At Count 3,** Williams stated a retaliation claim against Defendants Dr. Fenoglio, Martin, Philippe, Reed, and Hodge for delaying or denying medical treatment for Plaintiff's ankle, back, and shoulder injuries because Plaintiff had filed soy-diet-related grievances against Fenoglio and Martin and other grievances over inadequate treatment of these injuries. **At Count 4,** Williams stated a conspiracy claim against Defendants Martin and Hodge for conspiring to deny him medical treatment in retaliation for grievances he had filed against medical staff.

The IDOC Defendants (Boldrey, Dallas, Eubank, Hodge, Martin, Rhodes, Vaughn and Willis) seek summary judgment (Doc. 135), as do the Defendants (Cummins, Downey, Fenoglio, Phillippe, Potts and Reed) employed by Wexford Health Sources, Inc., ("Wexford") (Doc. 128). Williams responded in opposition to both motions. (Docs. 133 and 143). The Wexford Defendants filed a reply to Williams' response. (Doc. 139).

Rule 56(a) of the Federal Rules of Civil Procedure states, "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." When presented with a motion for summary judgment "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, **24 F.3d 918, 920 (7th Cir. 1994).** At this stage of the litigation, the Court must view the record in a light most favorable to the nonmoving party and draw all reasonable inferences in their favor. *Carson v. ALL Erection & Crane Rental Corp.*, **811 F.3d 993, 995 (7th Cir. 2016).** A motion for summary judgment is not a "vehicle for resolving factual disputes," *Waldridge*, **24 F.3d at 920**, but "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986)**.

With that standard in mind, we turn to Williams's complaint. Pursuant to the Eighth Amendment, prisoners are entitled to "adequate food, clothing, shelter, and medical care[.]" *Farmer v. Brennan*, **511 U.S. 825, 832 (1994)**. In other words, prisoners must be provided "the minimal civilized measure of life's necessities" as viewed under "the contemporary standard of decency[.]" *Rhodes v. Chapman*, **452 U.S. 337, 347 (1981)**. In the prison medical care context, the Supreme Court has held that the "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, **429 U.S. 97, 104 (1976) (internal citation and quotation omitted)**.

To establish a claim under the Eighth Amendment that prison officials provided inadequate medical care, the plaintiff must demonstrate two elements: (1) that he suffered from a serious medical need; and (2) that the defendants were deliberately indifferent to it. *Id*. The Seventh Circuit has defined a "serious medical need" as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." ***Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)**. Lack of treatment for lesser conditions, such as for slight colds or minor aches and pains, will not implicate the Eighth Amendment. ***Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)**.

In addition to demonstrating a serious medical need, the plaintiff must also show that the defendants were deliberately indifferent to the medical condition. "Deliberate indifference" is a state of mind component where the prison official defendant "knows of and disregards an excessive risk to inmate health or safety[.]" ***Farmer*, 511 U.S. at 837**. This is a standard above negligence, but less than purposeful – essentially akin to criminal recklessness. ***Id*. at 836**. A plaintiff does not need to show that "he was literally ignored" to establish an Eighth Amendment claim. ***Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011)**. The analysis becomes a bit more complicated when the defendant provides some medical treatment, but the plaintiff alleges that the treatment was ineffective. The line between ordinary negligence and deliberate indifference is not always clear in such situations. *See **Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)**. Deliberate indifference may be established if the defendant chose a "blatantly inappropriate" course of treatment that unnecessarily prolonged pain or exacerbated the injury. *Id*. at 730-731.

### A. Count I

Williams asserts that Dr. Fenoglio and IDOC Defendants Boldrey, Vaughn, Dallas, Willis, Eubank and Hodge were deliberately indifferent to his serious medical needs by failing to provide a low bunk and low gallery permit. As a preliminary matter, the IDOC Defendants submitted an affidavit from Lorie Cunningham, the current Lawrence Health Care Unit Administrator, stating that the non-healthcare staff members at Lawrence do not have the authority to issue a low bunk and low gallery permit. Williams has not presented any evidence to dispute Cunningham's affidavit. Moreover, prison officials working in non-medical roles (e.g., correctional officers and other security staff) are generally entitled to defer to the decisions of the health care professionals, so long as the prisoner is not being ignored, or it is obvious to a lay person that the treatment is inappropriate. *See Greeno*, **414 F.3d at 655**. Williams's medical records indicate that he was examined at the HCU on May 12 and May 14, 2012, and that he slipped on the stairs on May 15, 2012. Because Williams was seen at the HCU twice during this period of time, the IDOC Defendants could reasonably assume that Williams was receiving proper treatment, including consideration of whether he should be entitled to have a low gallery and low bunk permit. As such, no reasonable jury could find that they were deliberately indifferent as alleged in Count 1.

The remaining claim is Williams's deliberate indifference claim against Dr. Fenoglio for denying him the low bunk and low gallery permit. After Williams injured his ankle playing basketball on May 12, 2012, and before the May 15, 2012, incident on the stairs, Williams was seen by Dr. Fenoglio on only one occasion - May 14, 2012. Dr.

Fenoglio denies that Williams mentioned his cell placement at the May 14 examination. However, Williams testified at his deposition that he did request a permit at the May 14 examination, and for the purposes of summary judgment we will assume that Williams did make such a request. Nevertheless, isolated instances of misconduct are generally insufficient to support a claim of deliberate indifference. *Gutierrez v. Peters*, **111 F.3d 1364, 1374 (7th Cir. 1997)**.

Because Williams's cell was on the upper gallery, he was required to navigate one flight of stairs with a sprained ankle and a pair of crutches. Moreover, the incident report for May 15, 2012, states that Williams was only using one of his crutches to ascend the stairs when he was issued a prescription for a set of two crutches. Although the situation from May 12 through May 15, 2012, was less than ideal, it cannot be said that the denial of a low bunk and low gallery permit was akin to criminal recklessness, or that Williams was forced to endure a substantial risk of serious harm. As such, Dr. Fenoglio is also entitled to summary judgment on Count 1.

### B. Count 2

Williams proceeds on an Eighth Amendment deliberate indifference to serious medical needs claim against Defendants Fenoglio, Martin, Potts, Dowty, Cummins, Vaughn and Rhodes for failing to properly treat his back and shoulder injuries and for inadequate pain relief from those injuries. Starting with Dr. Fenoglio, the record shows that he examined Williams on four occasions in May 2012 and once more on September 13, 2012. During this period, Williams received a great deal of medical treatment. On May 14, 2012, Williams received an x-ray for his injured ankle, along with a permit for

15

crutches. After he slipped on the stairs, Williams returned to Dr. Fenoglio on May 16, 2012, and Williams was provided an analgesic balm. On May 21, 2012, Dr. Fenoglio again examined Williams and provided him with a prescription for Ultram, a stronger medication than the ibuprofen he was previously taking. Next, Williams returned for an examination on May 29, 2012, at which Dr. Fenoglio observed that his ankle was improving but arranged for a spinal x-ray due to complaints of back pain. After several examinations by other healthcare providers, on September 13, 2012, Williams was examined by Dr. Fenoglio for the last time. Due to continued complaints of shoulder pain, Dr. Fenoglio ordered a shoulder x-ray. Although Williams submitted medical records from a later date that indicated a rotator cuff injury, Dr. Fenoglio's x-rays did not show a dislocation or fracture. Moreover, Dr. Matticks examined Williams approximately one month later on October 12, 2012, and he also did not diagnose a rotator cuff injury.

When Dr. Fenoglio's treatment is viewed as a whole, no reasonable jury could find that he was deliberately indifferent to Williams' medical condition. He provided a great deal of medical care, and, when Williams continued to complain of shoulder pain, he arranged for x-rays to be taken. At most, the failure to diagnose the rotator cuff injury potentially rises to the level of negligence. Dr. Fenoglio did not, however, act with deliberate indifference.

Williams also asserts that IDOC Defendants Phil Martin, Cecil Vaughn and Rodney Rhodes were deliberately indifferent to his medical needs. Martin was the Health Care Unit Administrator while Williams was at Lawrence. Martin did not

provide healthcare services himself, but he did oversee the Health Care Unit operations and respond to some of Williams' grievances. Williams argues that Martin should have done more to ensure that he received proper treatment. However, Williams consistently was receiving treatment for his back and shoulder through the latter half of 2012. Dr. Fenoglio examined Williams on September 13, 2012, and Dr. Matticks examined him on October 12, 2012. Both physicians assessed that Williams' shoulder would improve over time through strength training. Martin is not a physician, and Williams's medical records from that period do not suggest that his treatment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." *Arnett v. Webster*, **658 F.3d 742, 751 (7th Cir. 2011) (quoting** *Duckworth v. Ahmad*, **532 F.3d 675, 679 (7th Cir.2008))**.

The deliberate indifference claim against Defendants Cecil Vaughn and Rodney Rhodes arises out of a specific incident that occurred on May 15, 2012, at the HCU. After Williams slipped on the stairs, he was escorted to the HCU. At the conclusion of the medical examination at the HCU, Vaughn and Rhodes picked up Williams off the examining table and placed him in a wheelchair. (Doc. 129-7, p. 25). Williams testified at his deposition that Vaughn and Rhodes placed him in the wheelchair too forcefully and that they should have allowed him to remain on the table because he was still in pain from the fall down the stairs. *Id*. However, Williams admitted at his deposition that the medical professionals at the HCU gave Vaughn and Rhodes permission to place him in the wheelchair. Again, non-medical prison employees are generally entitled to rely on the judgment of medical professionals. The medical professionals in the HCU told

17

Vaughn and Rhodes that Williams was capable of returning to his cell. The two then placed him in a wheelchair and escorted him out of the HCU. These actions do not rise to the level of deliberate indifference, and all Defendants are entitled to summary judgment on Count 2.

### C. Count 3

At Count 3, Williams stated a retaliation claim against Defendants Dr. Fenoglio, Martin, Philippe, Reed, and Hodge for delaying or denying medical treatment for Plaintiff's ankle, back, and shoulder injuries because he had filed soy-diet-related grievances against Fenoglio and Martin and other grievances over inadequate treatment of his injuries. (Doc. 129-7, p. 27). To establish a First Amendment retaliation claim, Williams must demonstrate that: "1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, **557 F.3d 541, 546 (7th Cir. 2009) (internal quote omitted)**. The "deprivation" caused by the prison officials' alleged retaliatory act need not violate the constitution by itself. For instance, prisoners do not have a constitutional right to be housed at a particular prison or to be selected for a prison job, but it is unlawful to transfer a prisoner or to revoke a prison job in retaliation for the prisoner exercising his rights. *See DeWalt v. Carter*, **224 F.3d 607, 618 (7th Cir. 2000)**. Although prisoners' constitutional rights are limited due to their incarceration, they do have a First Amendment right to file grievances. *Id*.

Here, Williams produces little more than speculation that the Defendants' actions were retaliatory in nature. Williams asserts that he should have received a low bunk and low gallery permit sooner. He also argues that the healthcare staff at the HCU delayed treatment for his shoulder injury. The causal link between Williams' grievances (soy related and otherwise) and any of the Defendants' actions is weak. Moreover, "[a] medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances." *Jackson v. Kotter*, **541 F.3d 688, 698 (7th Cir. 2008)**. Although Williams clearly engaged in protected First Amendment activity, no reasonable jury could find that he suffered a deprivation that would likely deter future First Amendment activity. Williams experienced a delay in obtaining a low bunk and low gallery permit, but he received a great deal of medical care in the latter half of 2012. When the course of treatment was not providing satisfactory results, the HCU ordered additional tests. The medical treatment did not produce results as quickly as Williams would have liked, but the thorough course of treatment cannot be said to be a deprivation likely to deter First Amendment activity in the future. As such, Defendants are entitled to summary judgment on Williams's retaliation claim at Count 3.

**D. Count 4**

In Count 4, Williams stated a conspiracy claim against Defendants Martin and Hodge for conspiring to deny him medical treatment in retaliation for grievances he had filed against medical staff. For the reasons previously stated, no reasonable jury could find that the Defendants were deliberately indifferent to his serious medical

needs or retaliated against him for filing grievances. Because no underlying constitutional violation occurred, Williams' conspiracy claim must fail. *See Huon v. Mudge*, 597 F. App'x 868, 877 (7th Cir. 2015)(citing *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008)("[C]onspiracy is not an independent basis of liability in § 1983 actions") *Bublitz v. Cottey*, 327 F.3d 485, 488 n.3 (7th Cir. 2003)(§ 1983 liability depends on proof of an underlying constitutional violation)).

## CONCLUSION

For all the above stated reasons, Defendants' motions for summary judgment (Docs. 128 and 135) as to all pending claims are hereby **GRANTED**. The Clerk of Court is directed to enter judgment in favor of Dr. James Fenoglio, Lynn Phillippe, Phil Martin, Stephanie Reed, Robert Boldrey, Alan Dallas, Brian Eubank, Dallas Willis, Rodney Rhodes, Patricia Potts, Claudia Dowty, Kelsey Cummins, Marc Hodge and Cecil Vaughn and against Plaintiff Leonard Williams. As no claims remain, all pending motions are **DENIED as MOOT**, and all settings are **CANCELED**.

**IT IS SO ORDERED**.

DATED: May 3, 2017

*s/ Michael J. Reagan*
MICHAEL J. REAGAN
**Chief Judge**
**United States District Court**